# EXHIBIT B

## IN THE CIRCUIT COURT FOR MAURY COUNTY, TENNESSEE
### TWENTY-SECOND JUDICIAL DISTRICT AT COLUMBIA

TANDY RAY KING,                    )
                                   )  Case No. 16538
    PLAINTIFF               )
                                   )
v.                                 )  JURY DEMAND
                                   )
MONSANTO COMPANY, BAYER            )
CORPORATION, BASF                  )
CORPORATION, and MAURY             )
MAURY FARMERS COOPERATIVE,         )
                                   )
    DEFENDANTS.             )

*(right margin, stamped:)* FILED SANDY McLAIN, CIRCUIT CLERK MAURY COUNTY, TN 2019 JUN 14 PM 3: 25

## COMPLAINT

Plaintiff Tandy Ray King, by and through counsel, hereby files this Complaint against Defendants and states as follows:

1.    Plaintiff Tandy Ray King is a farmer residing and doing business in Columbia, Maury County, Tennessee.

2.    Defendant Monsanto Company ("Monsanto") is a foreign for-profit corporation, incorporated in Delaware, and headquartered in St. Louis, Missouri. The registered agent for service of process is Corporation Service Company at 2908 Poston Avenue, Nashville, TN 37203.

3.    Defendant Bayer Corporation ("Bayer") is a foreign for-profit corporation incorporated in Indiana. The registered agent for Bayer is Corporation Service Company at 2908 Poston Avenue, Nashville, TN 37203. Bayer acquired Monsanto on June 7, 2018. Bayer did business in Maury County, Tennessee through its affiliate and subsidiary agent, Monsanto. All actions by Monsanto mentioned herein are imputed to Bayer, and, therefore, both will be collectively referenced as "Monsanto."

4.     Defendant BASF Corporation ("BASF") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Morris County, New Jersey. The registered agent for BASF is CT Corporation at 300 Montvue Road, Knoxville, TN 37919-5546

5.     Defendant Maury Farmers Cooperative (the "Co-Op") is a business entity with its principle place of business in Columbia, Tennessee. The registered agent for the Coop is Keith Farmer at 423 Westover Drive, Columbia, TN 38401.

6.     Venue is proper in that the acts complained of occurred within the confines of the jurisdiction of this Court.

## FACTUAL ALLEGATIONS

### I.     Nature of the Case

7.     This case involves the auxin herbicide dicamba, which is a highly volatile herbicide that was discovered in 1958 and marketed under various trade names.

8.     Due to its volatility, propensity to move off target, and ability to cause serious injury to non-target plants, dicamba was only used as a pre-planting or post-harvest burn down herbicide prior to November 2016, and was not approved for in-crop or over the top crop applications.

9.     Since the introduction of genetically modified seeds designed to be resistant to the active ingredient in Roundup in 1996, over-reliance on Monsanto's Roundup as a primary weed control herbicide created an environment in which Roundup resistant weeds flourished and proliferated across the United States.

10.     In order to retain its stranglehold on the seed and herbicide markets despite the decreasing efficacy of Roundup, Monsanto created new strains of soybean and cotton

2

that were resistant to dicamba – an older, more toxic, and more uncontrollable herbicide. Monsanto branded these dicamba resistant crops as Xtend varieties.

11.     Monsanto thereafter collaborated with BASF to develop new formulations of dicamba that could be marketed for in-crop uses and over the top crop application of Xtend soybeans and cotton.

12.     Monsanto and BASF marketed these formulations as revisionary break-throughs that minimalized volatility, and could be safely used without risk of causing harm to non-Xtend crops.

13.     In actuality, the new docamba herbicides are not appreciably less volatile than prior formulations of dicamba and have caused serious harm to crops throughout the United States.

14.     Monsanto and BASF sold these formulations of dicamba despite knowing that severe and widespread injuries would result, because Monsanto and BASF understood that such injuries would force farmers to defensively plant Xtend crops in future growing seasons and thereby increase the market for Xtendimax and Engenia, as well as Monsanto's Xtend soybean and cotton seeds.

15.     As a result of Monsanto's and BASF's greed, recklessness, and callous disregard of the rights of American farmers, thousands of farmers' livelihoods have been jeopardized and millions of acres of crops have been destroyed.

**II.     Dicamba**

16.     Dicamba (3,6-dichloro-o-anisic acid) is a non-selective auxin herbicide that mimics plant growth hormones.  It is highly toxic and highly mobile.

17.     Dicamba has traditionally been used for control of annual, simple perennial,

and creeping perennial broadleaves in non-crop situations, such as pre-planting and post-harvest burndown applications, and in grass crops such as corn, small grains, sorghum, turf, pastures, sodded roadsides, and rangeland.

18.     Dicamba is highly volatile, meaning that it is an herbicide that is not easily controlled and has a high likelihood of vaporizing and moving away from the area of application as a gaseous form.

19.     Consequently, injury to off-target vegetation is a major problem associated with dicamba.

20.     Until recently, dicamba was not approved or used for in crop applications, or over the top crop spraying, due to its high volatility.

21.     Volatility, also known as vapor drift, refers to the ability of an herbicide to vaporize and mix freely with air.  This occurs when an herbicide changes from a solid or liquid into a gaseous state and moves off the target area.

22.     When a volatile herbicide vaporizes, the herbicide vapor can travel long distances over long periods of time, and cause damage to non-target plants several miles away over the span of many days.

23.     Volatility is a characteristic of the formulation of an herbicide and its active ingredient – not all herbicides are sufficiently volatile to cause plant injury from vapor drift.

24.     Certain conditions, such as temperature, humidity, and mixture with additional herbicides can exacerbate the volatility of any given herbicide.

25.     Specifically, the volatility of dicamba greatly increases in high temperatures, low humidity, or when it is mixed with Roundup or glysophosate.

26.     Glyphosate is a non-volatile EPSP synthase inhibitor herbicide manufactured and marketed by Monsanto under the brand name Roundup since 1974.

27.     Dicamba can volatize days after application, travel considerable distances, and cause injuries to plants several miles away.

28.     The volatility of dicamba has been well known and studied for decades. Because of dicamba's volatility, and its extremely harmful effects on valuable non-target crops, the use of dicamba was limited to pre-planting and post-harvest burndown applications prior to 2016.

29.     A burndown application is used to clear an area of weeds and other residual pests prior to planting or after harvesting. Burndown applications are common in the early spring and late fall when there are typically no neighboring, growing crops to damage.

30.     Dicamba could not be, and was not, applied to planted crops after their emergence because it would damage the crops on which it was sprayed, and damage non-target crops in the vicinity after volatizing.

31.     As a result, dicamba – which was first sold by BASF under the brand name Banvel – has been on the market since the 1960s, but for all of the above reasons was little used in American agriculture until 2016. Despite the very limited use of dicamba, it was still responsible for a considerable amount of damage to non-target crops.

32.     Because dicamba was only used as a burndown herbicide, these off-target injuries were mostly sustained during cooler parts of the year.

33.     Dicamba causes injuries that are unique, distinctive, and easily distinguishable from other more common types of crop damage. Dicamba can cause cupping, curling, strapping, discoloration, leaf elongation, wrinkling, stunting, trumpeting,

and twisting of exposed plants, among other symptoms.

### III.   Monsanto

34.    In 1996, Monsanto began marketing seeds for crops that were genetically modified to be resistant to Roundup. Those seeds were branded as Roundup Ready, and include soybean and cotton crops.

35.    The availability of Roundup Ready crops allowed farmers to apply Roundup post-emergence, to control weeds during the growing season, without fear of harming their crops.

36.    Roundup and Roundup Ready crops, including soybean and cotton, quickly dominated the seed and herbicide markets due to the effectiveness of Roundup for weed control, the flexibility of post-emergence use, and the ease of using Roundup on Roundup Ready crops.

37.    Widespread adoption of Roundup Ready traits across a variety of crops, and the use of large volumes of Roundup over the course of several consecutive growing seasons, created conditions in which weeds that could survive glyphosate would flourish with little competition. These weeds are commonly referred to as being Roundup Ready or glyphosant resistant.

38.    Soon thereafter, multiple weeds developed Round-up resistant mutations, including horseweed, marestail, pigweed, palmar amaranth, spiny amaranth, waterhemp, ragweeds, kochia, ryegrass, Lamb's Quarters, bluegrass, Russian-thistle, and Johnsongrass.

39.    These weeds aggressively proliferated in the absence of natural competition or other types of weed control. By 2015, over 90 million acres of American farmland were

infested with Roundup resistant weeds.

40.     This posed serious challenges to farmers accustomed to planting Roundup Ready Crops, who began to turn to alternative weed control systems, crops sold by Monsanto's competitors, and used herbicides other than Roundup.

41.     Coinciding with the declining efficacy of Roundup was Monsanto's impending loss of patent protections for its Roundup product systems-Monsanto lost patent exclusivity for glyphosate beginning in 2000, and would lose patent exclusivity for the first generation of Roundup Ready seed for crops, including soybeans and cotton, in 2015.

42.     Monsanto intended to create new commercially available products that would be more efficacious than, and could replace, Roundup Ready products, which would soon be coming off patent and could be sold generically by Monsanto's competitors.

43.     Monsanto turned to dicamba because it is extremely toxic to the broadleaf weeds that developed immunity to glyphosate or Roundup.

44.     Dicamba, however, is also extremely toxic to commercially valuable broadleaf crops such as tobacco, soybean, cotton, and canola.

45.     While all dicots are sensitive to dicamba in general, certain crops including soybean, tomato, tobacco, and fruit are extraordinarily sensitive to dicamba, and can suffer severe injury at very low volumes of exposure.

46.     Depending on rates of exposure, soybean, tobacco, and fruit crops can suffer major, or even total, yield losses after exposure to dicamba. Additionally, exposure can cause lingering damages that can affect seed development, reduce seed quality, and limit the vitality of a plant's progeny.

47.     Monsanto wanted a dicamba herbicide that, unlike before, and similar to

glyphosate, could be applied "in-crop," in other words, over the top of growing plants.

48.     In order to apply dicamba in this manner so as to kill unwanted weeds but not the crop, a genetic modification for tolerance to dicamba would need to be developed.

**IV.     The Collaboration of Monsanto and BASF**

49.     Monsanto entered into agreements with BASF (the company that first sold a dicamba herbicide) to create, accelerate, promote, and commercialize a dicamba-based crop system.

50.     A genetically engineered trait for soybean and cotton seed to withstand dicamba was developed by Monsanto and BASF, marketed and sold expressly for in-crop use of dicamba herbicide. There is no reason for, or value in, genetic modification to tolerate dicamba herbicide except for in-crop use of such herbicide.

51.     At all relevant times, Monsanto and BASF acted together in the design, development, promotion, marketing and sale of such a system, consisting of the dicamba resistant trait, seed containing that trait, and dicamba herbicide.

52.     Monsanto and BASF entered into one or more agreements to combine the property, money, efforts, skill and knowledge in partnership, joint venture or joint enterprise for their mutual benefit and profit, with common purpose and community of interest in that purpose, equal right to voice and control, and the sharing of profits and losses.

53.     Monsanto and BASF aggressively advertised and touted what became the Roundup Ready Xtend Crop System ("Xtend Crop System"), designed as and consisting of seed containing the dicamba-resistant trait and dicamba herbicide. Monsanto and BASF consider – and have always described and marketed – seed containing the dicamba-

resistant trait and dicamba herbicide.

54.     Monsanto and BASF conducted joint field testing of dicamba-based formulations applied over the top of dicamba-tolerant soybeans in development. Their collaboration also includes joint development of stewardship, education programs, and best practices to "support long term sustainability" of a dicamba-tolerant system.

55.     The price of seed engineered for dicamba resistance is more than seed without it. The only meaningful difference between the Xtend seed and other comparable RR seed is the trait for dicamba resistance.

56.     While Monsanto touts high yield of seed containing the dicamba-resistance trait, Monsanto describes that yield as "the same" as without the resistance.

57.     There is no benefit to the Xtend trait other than resistance to dicamba, and no benefit to dicamba resistance other than in-crop use of dicamba herbicide.

58.     The dicamba-based crop system designed, developed, accelerated, licensed and sold by Monsanto and BASF poses unreasonable risk of harm to susceptible plants and crops not resistant to dicamba.

59.     Monsanto and BASF designed, developed, marketed, promoted, distributed, licensed, and sold the dicamba-resistant trait, seed containing that trait, and dicamba herbicide as an integrated crop system, knowing that it would result in damage to susceptible non-resistant plants and crops and with the knowledge and intent that farmers would have no alternative but to purchase seed containing the trait as a defense, ever increasing demand and Defendants' profits.

60.     Monsanto and BASF designs and manufactures all Xtend seeds.

61.     The dicamba herbicides that would come to be known as Xtendimax,

9

Engenia, and Fexapan were results of the research, design and testing by Monsanto and BASF.

62.     Monsanto manufactures, markets, and sells Xtendimax with VaporGrip Technology.

63.     Monsanto entered into an agreement with DuPont under which Monsanto supplied DuPont with, and allowed it to market and sell Xtendimax with VaporGrip Technology

64.     BASF manufactures, markets, and sells Engenia.

**V.      Insufficient Testing and Warnings**

65.     Both the United States Department of Agriculture (USDA) and Environmental Protection Agency (EPA) expressed significant concerns about the risks that may be created by the introduction of dicamba resistant crops and increased usage of dicamba.

66.     Specially, the EPA expressed concerns "related to a potential increase in usage of dicamba products and the proposed changes in the timing of applications. In general, there is also a potential for increased susceptibility of late season plants to direct impact from off-site transport." The agency warned in March 2011 that "applications during a warmer time (i.e post-emergence) may increase off-site transport (via volatility) during a time when many plants have leafed out…therefore a post-emergence application may increase the likelihood of effects on non-target plants".

67.     The USDA stated that use of dicamba over a longer season "could increase exposure of dicamba-sensitive plants at a growth stages late in the season," and that "the potential for undesired volatization or drift of applied dicamba onto organic crops is of

high possibility."

68.     As a result, both agencies delayed approval of the products they regulated. EPA, which regulated pesticides, delayed registration of Xtendimax and Engenia, and required multiple additional submissions before approval was reached.

69.     Similarly, the USDA delayed approval of Xtend variety soybean and cotton, and required Monsanto to make multiple revisions to its petitions for determination of nonregulated status of its dicamba resistant varieties.

70.     Monsanto and BASF failed to provide the EPA with the results of rigorous, independent testing or analysis on the volatility of their products in real world applications, or on how dangerous their products would be to off-target crops. Monsanto expressly forbade independent testing of Xtendimax by the Arkansas Plant Board because the results might jeopardize the approval by the EPA.

71.     Indeed, even upon approving theses formulations for use. The EPA cautioned that "[s]everal formulations of dicamba are intended to reduce volatilization of dicamba in the first few days after application, but the ability of these formulations to delay the formation of the volatile dicamba acid, under a range of environmental conditions, is not well understood."

72.     Likewise, Dr. Kevin Bradley at the University of Missouri commented that we really can't tell you anything about the volatility or its potential volatility, because we have not been able to do that research, and that's really unfortunate."

73.     Nevertheless, Monsanto and BASF advertised their new formulations as "low-volatility" herbicides that could be used safely and without fear of off-target movement.

11

74.     Monsanto advertised its VaporGrip technology, which is featured in both Xtendimax and Fexapan, as "[a] revolutionary breakthrough" that "provides growers and applicators confidence in on-target application of dicamba."

75.     Similar statements were repeated by Monsanto to customers and agricultural professionals through a variety of media, personal contacts, and sales presentations.

76.     However, the veracity of these statements was never demonstrated to regulators or independent researchers.

77.     Aaron Harger, at the University of Illinois, stated in March 2017 that "[w]e never evaluated whether or not these formulations are, in fact, lower-volatility formulations. We have no data to demonstrate if, in fact, it's lower-volatility."

78.     Further, neither Monsanto nor BASF ever related evidence that the formulations of dicamba would not volatize under the real-life conditions in which they were intended to be used.

79.     In fact, in the conditions in which they are intended to be used, Xtendimax, Engenia, and Fexapan, are not appreciably less volatile than older formulations of dicamba, such as Banvel or Clarity.

80.     When asked as early as 2013 how Monsanto was going to manage the off-target issues with dicamba, a representative for Monsanto testified that "everyone will just have to plant Xtend crops, and then it won't be an issue." *Bader Farms, Inc. v. Monsanto Co.,* No. 1:16-CV-00299 (E.D. Mo.), Baldwin Dep. Tr. (Oct. 31, 2017) at 19:23-20:6.

81.     In lieu of properly researching, designing, and testing their products to ensure they were safe prior to marketing them, Monsanto and BASF used American

farmers as real-life guinea pigs during the 2017 growing season.

82.     Monsanto estimated that 20 million acres of Xtend variety soybeans, and 5 million acres of Xtend variety cotton were planted during the 2017 crop year.

83.     Monsanto estimated that 40 million acres, representing approximately ½ of the soybean market, of Xtend variety soybeans were planted during the 2018 crop year.

84.     Monsanto and BASF knew formulations of dicamba would be used on those vast acreages, and knew that non-Xtend crops within the vicinity would be placed at risk if their dicamba products moved off target.

85.     Monsanto and BASF knew that their formulations of dicamba, and dicamba generally, is more likely to volatize and move off target during higher temperatures, lower humidity, or when mixed with glyphosate – precisely the conditions in which Xtendimax, Engenia, and Fexapan were intended to be used.

86.     Despite that knowledge, neither Monsanto nor BASF ever warned growers or applicators of the likelihood that its dicamba products would volatize and injure their neighbors' crops when used for in-crop applications.

87.     Monsanto and BASF knew that temperature inversions, which are common in soybean and cotton growing regions during the summer months, create a high potential for off-target movement of dicamba.

88.     A temperature inversion occurs when dicamba particles on or near the surface are cooler than the air above. This phenomenon is common in the Mid-south and Midwest of the U.S during clear summer nights.

89.     When a temperature inversion occurs, dicamba particles on or near the surface are suspended into the atmosphere and can travel for miles in concentrated clouds.

90.     While the labels for Xtendimax, Engenia, and Fexapan warn that applications should not be made during a temperature inversion, neither Monsanto nor BASF warned growers or applicators of the likelihood that temperature inversions would cause large amounts of off target movement in dicamba applications that were made hours or days prior to the development of a temperature inversion.

91.     Instead of warning about the severe risks of off-target movement of dicamba through volatility and temperature inversion, Monsanto and BASF maintained that off-target movement of their products would most likely occur from spray drift. Spray drift occurs when small droplets move to nontarget vegetation during application without ever landing on the target site.

**VI.     Full Scale Dicamba System Rollout in 2017**

92.     EPA registration for the new formulations of in-crop dicamba herbicides came after harvest in 2016.

93.     An EPA registration is not an endorsement of an herbicide. *See, e.g.,* Notice of Registration for Engenia dated December 20, 2016 ("Registration is in no way to be construed as an endorsement or recommendation of this product by the Agency.")

94.     In 2017, Monsanto launched XtendiMax as a low-volatility dicamba formulation with VaporGrip Technology for use with seed containing the dicamba-resistant trait.

95.     In 2017, DuPont launched FeXapan as a low-volatility dicamba formulation with Vapor Grip Technology for use with Xtend seed, which DuPont promotes as part of its own advertising as "part of the Roundup Ready 2 Xtend Acre Solution.

96.     In 2017, BASF launched Engenia as a low volatility dicamba formulation

for use with seed containing the dicamba-resistant trait, which BASF promotes in its own advertising as "Dicamba-tolerant soybean sold under the trait name Roundup Ready 2 Xtend Soybeans."

### VII.    Continuing Deceptive Advertising

97.    All the while, before and after 2017, Monsanto and BASF continued their deceptive advertising.

98.    Monsanto and BASF continued playing on concerns over glyphosate resistance and assuring growers that the new dicamba formulations would be low in volatility and could be applied without off-target movement. Again, they promoted the dicamba-based crop system as safe when it was not.

99.    Monsanto and BASF made, and continue to make such representations, and omissions when they knew, and intended, that dicamba would be sprayed extensively and multiple times, in hot summer months, in areas of proximity to susceptible non-resistant plants and crops.

100.    Such statements and omissions were made by Monsanto and BASF with knowledge of or reckless disregard for their falsity.

101.    Among other things, Monsanto and BASF did not disclose:

a.    Prior use of dicamba for pre-emergent and post-harvest burndown is different than over-the-top application during the hot summer months and poses risks, including volatility, not present in burndown;

b.    Volatility in new formulations remains a substantial risk;

c.    Even minute levels of exposure injure susceptible, non-tolerant plants whether through volatilization and/or drift;

    d.   Pre-release testing was insufficient and inadequate;

    e.   Xtendimax with "Vapor Grip Technology" was not independently tested by outside scientists contrary to industry practice;

    f.   The vast majority of Monsanto's testing was not on Xtendimax with VaporGrip technology;

    g.   Following label instructions does not prevent volatilization;

    h.   Successful on-target application does not prevent volatilization

    i.   The new formulations are not significantly lower in volatility than older versions when used in real world conditions;

    j.   Dicamba can and does move from target after application and over long distances; and

    k.   The scale of spraying in given areas increases the risk of harm to non-resistant crops and plants.

102.    The product labels were and are inadequate to address the dangers associated with the Xtend Crop System.  Monsanto and BASF failed to adequately warn of these dangers by label or otherwise, and failed to adequately train applicators how to avoid injury to non-residential plants and crops.

**VIII.  Insufficient, Misleading, Deceptive, and Unworkable Labels**

103.    The labels for Xtendimax and Engenia (as well as Fexpan) contain false and misleading statements and impressions, omissions, and lack warnings and instructions adequate to protect the environment and prevent injury to non-resistant plants and crops susceptible to dicamba.

104.    Directions for use are not stated in terms easily read and understood by the

average person likely to use or to supervise use of the herbicides. The directions when followed also were not and are not adequate to prevent unreasonable adverse effects on the environment, including non-resistant plants and crops susceptible to dicamba.

105.   Among other things, the labels all state that the herbicides should not be used during a temperature inversion. Temperature inversions, however, are difficult to predict.

106.   The labels state that the herbicides should not be sprayed when wind speed is under 3 mph or over 10-15 mph. Temperature inversions often occur, however, when wind speed is less than 10 mph.

107.   Wind speed is also difficult to predict, particularly wind gusts.

108.   In addition, XtendiMax and Engenia lables state that the herbicide sgould not be sprayed after sunset. The FeXapan label state that temperature inversions can begin to form at sunset.

109.   In addition, dicamba can and does volatize after application for periods *exceeding* 24 hours and that risk continues regardless of conditions at the time of spraying.

110.   Even when sprayed properly, the in-crop dicamba herbicides still can and do volatize (including in winds of 3 mph or lower).

111.   Also, field tests (independently undertaken in 2017) show that volatility of the new dicamba formulations occurred over at least a 2-3 day period ater application.

112.   With inversions in summertime frequently occurring, the result is volatized dicamba and fine droplets catching in the inversion layer and moving *en masse* to affect others' fields. This is a chemical effect that occurs even when application instructions are followed.

113. As even described by the EPA, the level of precaution necessary to prevent dicamba from moving off-target is "extraordinary." Tom Polansek, *Monsanto, BASF weed killers strain U.S. states with damage complaints* (November 1, 2017).

114. Dr. Larry Steckel, a professor of Weed Science at the University of Tennessee, expressed these concerns directly to Monsanto at a conference when he explained that following the label was "[nearly impossible" as, among other things there is only a "very small window of time" in which to spray, the low 24 inch boom height is "a joke," and in regard to spraying instructions based on rain: "who is that accurate of a forecaster." GM Watch, *Will new restrictions on dicamba spraying save US food crops?* (Dec. 8, 2017).

**IX.    Dicamba Damage in 2017 and 2018**

115. Farmers planted seed containing the dicamba-resistant trait on at leasr 25 million acres of soybean and cotton fields in 2017.

116. The spike from one million acres of Xtend soybeans and three million acres of Xtend cotton in 2016 to 25 million or more acres in 2017 is direct result of the dicamba disaster Defendants conspired to set in motion.

117. Monsanto predicted that its Xtend soybeans would expand to 40 million acres of soybeans planted in 2018, which represents half of the soybean market in the United States.

118. Monsanto and BASF knew that dicamba damage would again occur and would be even more widespread.

119. The dramatic increase in damage during 2017 and 2018 was a direct result of the proliferation of the dicamba-resistant trait and Xtend Crop System.

120.    Symptomology of dicamba damage, including leaf cupping, is unique to dicamba. Cupping throughout a field is a typical pattern indicating volatilization, as opposed to spray drift, which displays a plume of damage that diminishes with distance from the spray source. Other syptoms include strapping, leaf elongation, stunting and/or stem twisting.

121.    Dr. Steckel explained: "This is a landscape level redistribution of that herbicide" as opposed to physical drift which often injures in a pattern in the field. According to Dr. Steckel: "It's a 200-acre or larger fields covered pretty uniformly. I've never seen anything like it." Pam Smith, *Dicamba Debate Continues* (July 12, 2017).

122.    Monsanto and BASF (as well as DuPont) have gone on the offensive, vigorously denying volatility, which had been independently verified by multiple weed scientists, attacking scientists who questions them, and blaming farmers along with everyone else but themselves.

123.    These statements conflict with uniform findings of independent experts that there *was* volatility in 2017 and 2018 and that volatility was the major reason for the harm that occurred. As observed by Dr. Steckel, volatility is "hard to address when registrants, despite evidence, will not consider it an issue." Monsanto Extend Academic Summit (Iowa State University) Slides presented in St. Louis MO, September 27-29, 2017.

124.    Monsanto and BASF also put the blame on applicators who they say did not follow label instructions.

125.    Education, however, does not fix the dicamba herbicide's volatility and propensity for off-target movement, especially in climate conditions when it can volatize off soil and plants to move miles away to susceptible plants. Application methods also do

not prevent volatilization. Ford Baldwin explains: "Additional application restrictions …

simply will not fix this problem." Ford Baldwin, *latest dicamba research and a new task

force* (Aug. 17, 2017).

126.    Monsanto and BASF attacked even the independent experts, attempting to

discredit and intimidate them. Bob Scott, weed scientist at the University of Arkansas,

reads such tactics "as an attack on all of us, and anybody who dares to [gather] outside

data." Dan Charles, *Monsanto Attacks Scientists After Studies Show Trouble for

Weedkiller Dicamba* (Oct. 26, 2017).

### X.    Regulatory Aftermath of 2017 Dicamba Damage

127.    In October 2017, the EPA announced that, by agreement with Monsanto,

BASF, and DuPont, it was re-classifying in-crop dicamba as a restricted use herbicide.

Among other things, only certified applicators with special training, and those under

supervision, may purchase and apply in-crop dicamba during the 2018 growing season.

Other changes include: additional record-keeping requirements; limiting applications to

when maximum wind speeds are below 10 mph (from 15 mph); reducing the times during

the day when applications can occur; and additional tank clean-out instructions.

128.    In September 2017, the Arkansas Plant Board voted to ban applications of

dicamba after April 15 in Arkansas.

129.    The Tennessee Department of Agriculture advised soybean and cotton

farmers to follow federal guidelines when applying pesticides containing dicamba

approved for "over the top" use.

### XI.    Defensive Purchasing of Dicamba-Resistant Seed

130.    Farmers have purchased and will continue to purchase seed containing the

dicamba-resistant trait at higher prices for defensive purposes even if they are not otherwise interested in the base germplasm of the seed or dicamba resistance itself.

131.    As one farmer put it: "[Monsanto] knew that people would buy [Xtend] just to protect themselves... You're pretty well going to have to.. It's a good marketing strategy, I guess. It kind of sucks for us.". Jack Kaskey & Lydia Mulvany, Bloomberg, *Creating a Problem – And a Lucrative Solution* (Sept. 5, 2016).

132.    Monsanto was so confident in expansion of the Xtend crop system that by 2015 it already had announced that it would invest almost $1 billion investment in a dicamba production facility.

133.    BASF was so confident of expansion of the Xtend Crop System that it had, by June 2014, announced plans to increase its dicamba production by fifty percent.

134.    Monsanto projects that the number of soybean acres planted with the dicamba-resistant trait will be 50 million acres, up from a projected 40 million in 2018 and the 1 million acres planted in 2017.

135.    The more crops planted with the dicamba resistant seed and the more dicamba sprayed after emergence of susceptible non-resistant crops, the more damage there will be and the more farmers will be forced to buy the seed to protect themselves at higher cost.

136.    Monsanto's and BASF's attempt to force everyone into a dicamba-based system is not reasonable or in the public interest.

137.    Even this course is unavailable to farmers, such as Plaintiff, who grow crops for which there is no dicamba tolerant seed.

**XII.    Plaintiff**

138.   Plaintiff is a tobacco farmer who owns and operates a farm on Green Mills Road in Columbia, Tennessee and leases and operates a farm on Carter's Creek in Columbia, Tennessee.  Plaintiff has grown tobacco for over 50 years.

139.   Plaintiff's tobacco plants were first damaged by dicamba in the 2017 planting season.

140.   An investigation revealed that the damage was due to the application of a product containing dicamba to the fields of Plaintiff's neighbor, John Ring.

141.   An action is currently pending against Mr. Ring in this Court, Case No. 16257.

142.   In late June, 2018, Plaintiff first noticed damage to some of his tobacco similar to the damage the prior year.

143.   Specifically, the tobacco leaves had hooding, curling, and yellowing, which are all indicative of damage from dicamba.

144.   Plaintiff subsequently noticed dicamba damage to other tobacco, which had been planted later.

145.   Upon information and belief, Plaintiff's crops suffered damage from multiple dicamba vapor drifts from the application of dicamba herbicides on the crops of his neighbors who used Xtend dicamba-resistant seeds.

146.   In the three years prior to 2017 (when Plaintiff's crops were first damaged by dicamba), Plaintiff produced an average of more than 3,200 pounds of tobacco per acre per year.  Because of the dicamba damage, Plaintiff produced an average of only 1,508.55 pounds of tobacco per acre in 2018.

147.   Consequently, because of the dicamba damage to Plaintiff's crops, Plaintiff

earned substantially less compensation from the sale of his tobacco than he otherwise would have in 2018.

### XIII.  Maury County Cooperative

148.    In 2018, Tennessee followed the EPA Guidelines and required that anyone who sprayed a Restricted Use Pesticide, which include herbicides containing dicamba, to become commercially certified.

149.    The Co-Op is commercially certified to spray dicamba herbicides and offers to spray dicamba herbicides in exchange for compensation.  The Co-Op represents that it can safely spray dicamba herbicide according to the directions.

150.    Upon information and belief, the Co-Op handles all or the vast majority of the spraying of dicamba herbicides during the planting and growing season for the farms in Maury County.

151.    Upon information and belief, every farm within a 10-mile radius of Plaintiff that has used a dicamba herbicide during the planting and growing season has engaged the Co-Op to spray such herbicide.

152.    For example, the Co-Op's records indicate that the Co-Op sprayed Engenia mixed with Roundup PowerMAX II for Stephen Finley who grows soybeans in Maury Couny.  Roundup PowerMax II lowers the pH of the formula in the tank and in the soil. According to expert Tom Mueller, lowering the pH in the tank increases offsite emissions of dicamba.

153.    Upon information and belief, Plaintiff's crops were damaged from the dicamba herbicide sprayed by the Co-Op on the crops of farms in the vicinity of Plaintiff's crops.

## COUNT I: NEGLIGENCE

154.     Plaintiff incorporates the above-referenced paragraphs as if restated herein.

155.     At all relevant times, Monsanto and BASF (the "Corporate Defendants") had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect research, distribute, market, label, package, distribute, prepare for use, sell, and adequately warn of the risks and dangers of dicamba herbicide.

156.     The Corporate Defendants failed to use ordinary care in manufacturing, designing, formulating, compounding, testing, producing, assembling, inspecting, researching, marketing, labeling, packaging, distributing, and preparing for use, selling and adequately warning of the danger of these products.

157.     As a proximate result of the Corporate Defendants' careless behavior, Plaintiff's crops were damaged.  Such results were entirely foreseeable by the Corporate Defendants.

158.     At all relevant times, the Co-Op had a duty to spray herbicides containing dicamba in such a manner that it would not cause damage to Plaintiff's crops.

159.     If the Corporate Defendants' representations that dicamba can be sprayed safely if sprayed according to the directions are correct, then the Co-Op breached its duty to Plaintiff when it sprayed dicamba herbicide in such a manner that the dicamba drifted to Plaintiff's farm and damaged Plaintiff's crops.

160.     The Corporate Defendants' actions constitute negligence.  In the alternative, the Co-Op's actions constitute negligence

161.     As a result of the Defendants' negligence, Plaintiff has suffered damages in an amount to be proven at trial.

## COUNT II: STRICT LIABILITY – DEFECTIVE DESIGN

162.    Plaintiff incorporates the above-referenced as if restated herein.

163.    At all relevant times, the Corporate Defendants researched, designed, developed, tested, manufactured and/or marketed products with dicamba.

164.    The dicamba products are defective in design or formulation in that they are not reasonably fit, suitable, or safe for their intended purpose. They cannot be used safely without causing severe risk of harm to others' crops, and their foreseeable risks exceed the benefits associated with their design and formulation.

165.    The design of these products is defective and unsafe in that it causes severe crop injuries as a result of volatility and off target movement, including but not limited to movement through volatility, temperature inversion, and spray drift.

166.    The design defect makes Xtendimax, Engenia, and FeXapan unreasonably dangerous, yet the Corporate Defendants knowingly introduced these products into the market.

167.    As a direct and proximate cause of the manufacture, sale and promotion of the defectively designed Xtendimax, Engenia, and FeXapan, Plaintiff sustained serious injury to his crops.

168.    The conduct of the Corporate Defendants, as described above, was reckless. The Corporate Defendants risk the livelihoods of American farmers, including Plaintiff, with knowledge of the severe dangers of off target movement of Xtendimax, Engenia, and FeXapan and suppressed this knowledge from the general public. The Corporate Defendants made conscious decisions to not redesign, re-label, warn or inform the unsuspecting public. The Corporate Defendants' reckless conduct warrants an award of

punitive damages.

## COUNT III: STRICT LIABILITY – FAILURE TO WARN

169.    Plaintiff incorporates the above-referenced paragraphs as if restated herein.

170.    The Corporate Defendants researched, developed, designed, tested, manufactured, inspected, labeled distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the dicamba herbicide Xtendimax, Engenia and FeXapan; in the course of the same, the Corporate Defendants directly advertised or marketed these products to the EPA, agricultural professionals, and consumers and, therefore, had a duty to warn of the risks associated with these products.

171.    Xtendimax, Engenia, and FeXapan were defective due to inadequate warnings or instructions because the Corporate Defendants knew or should have known that the products created significant risks of harm to non-Xtend crops, and they failed to adequately warn consumers, regulators, and innocent bystanders of such risks.

172.    The Corporate Defendants failed to adequately warn consumers, regulators, and innocent bystanders that Xtendimax, Engenia, and FeXapan could cause severe crop injuries through volatility, temperature inversions and spray drift.

173.    The Corporate Defendants failed to adequately warn consumers, regulators, and innocent bystanders that Xtendimax, Engenia, and FeXapan would volatize in high heat, low humidity, or when mixed with glyphosate.

174.    The Corporate Defendants failed to adequately warn consumers, regulators, and innocent bystanders that Xtendimax, Engenia, and FeXapan would move off target through temperature inversions hours and days after application.

175.    Xtendimax, Engenia, and FeXapan were defective due to inadequate post-

26

marketing warnings or instructions because, even though the Corporate Defendants knew or should have known of the risk of severe crop injuries from the use of their products, the Corporate Defendants failed to provide an adequate warning to consumers or innocent bystanders, knowing these products could cause injury.

176. The Corporate Defendants failed to perform or otherwise facilitate adequate testing of Xtendimax, Engenia, and FeXapan; failed to reveal and/or concealed testing and research data; and selectively and misleadingly revealed and/or analyzed testing and research data.

177. As a direct and proximate result of the reasonably anticipated use of Xtendimax, Engenia, and FeXapan as manufactured, designed, sold, supplied, marketed, and/or introduced into the stream of commerce by the Corporate Defendants, Plaintiff suffered serious crop injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

178. The Corporate Defendants' conduct, as described above, was reckless. The Corporate Defendants risk the lives of American farmers, including Plaintiff, with knowledge of the severe dangers of off target movement of Xtendimax, Engenia, and FeXapan and suppressed this knowledge from the general public. The Corporate Defendants made conscious decisions not to redesign, relabel, warn or inform the unsuspecting public. The Corporate Defendants' reckless conduct supports punitive damages.

### COUNT IV: TENNESSEE CONSUMER PROTECTION ACT

179. Plaintiff incorporates the above-referenced paragraphs as if restated herein.

180. The Corporate Defendants engaged in unfair competition or unfair,

unconscionable, and deceptive acts or practices in violation of the Tennessee Consumer Protection Act when they failed to adequately warn consumers and the agricultural community of the safety risks associated with the dicamba products, specifically including Xtendimax, Engenia, and FeXapan  As a direct result of the Corporate Defendants' deceptive, unfair, and unconscionable conduct, Plaintiff suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

181.    Specifically, in making false and misleading representations and omissions of material facts regarding the safety of and potential risks of the dicamba products and in failing to warn about the risks, the Corporate Defendants represented that the dicamba products had characteristics, uses, and benefits that they do not have in violation of Tenn. Code Ann. § 47-18-104(b)(5).

182.    As a direct and proximate result of the Corporate Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

183.    The Corporate Defendants have violated the Tennessee Consumer Protection Act, Tenn. Code Ann § 47-18-101 *et seq.*, and are liable to Plaintiff for compensatory, statutory, and treble damages, in amounts to be proven at trial, together with interest, attorney's fees, and court costs.

### COUNT V: CIVIL CONSPIRACY

184.    Plaintiff incorporates the above-referenced paragraphs as if restated herein.

185.    The Corporate Defendants, in an unlawful, fraudulent, deceptive scheme and device to improperly market, sell, and expand sales and profits from the defective Xtend Crop System, conspired with each other to create fear-based demand for the dicamba

resistant trait, and correspondingly more sales and use of the dicamba herbicide, proliferating the dicamba-based system and thereby profiting from the ecological disaster it causes.

186.    The object of the conspiracy was and is to create and perpetuate an ecological disaster through use of the defective, dangerous Xtend Crop System, forcing farmers to purchase dicamba-resistant technology out of self-defense in order to protect their crops from dicamba damage at the expense of producers like Plaintiff, whose non-resistant crops were damaged.

187.    Early on, the Corporate Defendants formed a partnership, joint venture, or joint enterprise, or otherwise agreed to share technologies in order to speed the dicamba-based system to market.

188.    The Corporate Defendants are intertwined in the course of action to a great degree. They both funded and developed the biotechnology for dicamba resistance and share in profits from its commercialization. BASF provided its proprietary dicamba formulation to Monsanto, whose XtendiMax is the same as BASF's Clarity only with Monsanto's additive called VapoGrip. They participated in joint field tests and jointly developed stewardship and education programs to "support long term sustainability" of a dicamba-tolerant system.

189.    The Corporate Defendants both invested in dicamba production facilities in preparation for the demand they knew would be created by damage the Xtend Crop System would and did cause.

190.    The Corporate Defendants knew the risks to susceptible non-dicamba resistant plants and crops, particularly tobacco which is highly sensitive to dicamba, even

at very low levels.

191.    The Corporate Defendants conspired to and did falsely advertise and market the Xtend Crop System's dicamba herbicides as low volatility and capable of remaining on target to mislead farmers, create and increase demand for the dicamba-resistant trait technology, and herbicides.

192.    The Corporate Defendants knew that even the supposed lower volatility dicamba still is volatile and still at high risk of movement onto susceptible non-resistant plants and crops, causing them damage.

193.    The Corporate Defendants conspired to and did inadequately warn, omit, and conceal the risks, especially volatility, from the public, weed scientists, and persons who would be using the Xtend Crop System, in order to and with the intent of increasing damage to non-resistant crops and driving up fear-based demand for dicamba-resistant seed and correspondingly, more dicamba herbicides.

194.    The Corporate Defendants conspired to and did inadequately educate, train or instruct on the safe use of the Xtend Crop System, notwithstanding that each clearly knew the importance thereof to have even minimal chance of safe use, also in order to and with the intent of increasing damage to non-resistant crops and driving up fear-based demand for dicamba resistant seed and correspondingly, more dicamba herbicides.

195.    The Corporate Defendants jointly proceeded with the full-scale launch of the Xtend Crop System, causing a wave of destruction to susceptible non-dicamba resistant plants and crops, including Plaintiff's tobacco crops.

196.    In response to the damage, the Corporate Defendants issued coordinated public statements and offered identical stated causes for the damage, none of which had to

do with the Xtend Crop System, in order to further ensure ever-increasing demand and profits.

197.    The Corporate Defendants' scheme was intended to and has caused farmers to purchase seed containing the dicamba-resistant trait out of self-defense, leading to more sales and use of dicamba herbicides, which has and will cause more damage, resulting in more sales of dicamba with the dicamba-resistant trait.

198.    The Corporate Defendants' unlawful actions resulted in damages to Plaintiff who was harmed in the manner described above.

## PRAYER FOR RELIEF

**WHEREFORE,** premises considered, Plaintiff prays for relief and judgment against each of the Defendants, as appropriate to each cause of action alleged, as follows:

a)    That Defendants be served with a copy of the Summons and Complaint and be required to answer within the time prescribed by law;

b)    That the Court enter preliminary and permanent injunctions providing that Monsanto and BASF shall be enjoined from selling, marketing distributing, or otherwise disseminating Xtend crops;

c)    That the Court award Plaintiff monetary damages against Monsanto and BASF, jointly and severally, including compensatory relief to which Plaintiff is entitled according to proof at the time of trial;

d)    That the Court award punitive and exemplary damages for Monsanto's and BASF's willful, malicious and/or reckless behavior in an amount within the jurisdiction of this Court according to proof at the time of trial;

e)    In the alternative of awarding relief against Monsanto and BASF, that the

Court award Plaintiff monetary damages against the Co-Op including compensatory relief to which the Plaintiff is entitled according to proof at trial;

     f)     That the Court award statutory damages in an amount within the jurisdiction of this Court and according to proof at the time of trial;

     g)     That the Court award restitution, disgorgement of profits and other equitable relief;

     h)     That the Court award Plaintiff reasonable attorneys' fees;

     i)     That Defendants be taxed with the costs of this action;

     j)     That Plaintiff recover both pre-judgment and post-judgment interest;

     k)     That a jury be impaneled to hear this case; and

     l)     That Plaintiff be awarded any and all other relief to which he may be entitled.

Respectfully Submitted,

**MCKELLAR|HYDE, PLC**

Andrea Taylor McKellar, BPR #019618
4235 Hillsboro Pike, Suite 300
Nashville, TN 37215
T: (615) 866-9828
F: (615) 866-9863

*Counsel for Plaintiff*

Andrea McKuler
4235 Hillsboro Pike, Suite 300
Nashville, TN 37215





Monsanto Company
C/o Corporation Service Co.
2908 Poston Ave.
Nashville, TN 37203